# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

OTIS LARUE HUNTER, JR.,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

Case No. 20-CV-1883-JPS

# ORDER

On December 21, 2020, Petitioner Otis Larue Hunter, Jr. ("Petitioner") filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. ECF No. 1. The Court screened the motion on August 10, 2021, noting that Petitioner presented two grounds for relief, "both of which are premised on ineffective assistance of counsel in violation of the Sixth Amendment." ECF No. 6 at 2. After concluding that the motion was timely, not procedurally defaulted, and not clearly frivolous, the Court set a briefing schedule. *Id.* at 6.

Respondent filed a response to the motion on October 8, 2021. ECF No. 7. Thereafter, Petitioner received over a year's worth of extensions to file his reply. *See* ECF Nos. 8, 11, 13, 20, 22. Following the final extension, the Court received Petitioner's reply late. ECF No. 24. The motion is now fully briefed. For the reasons stated herein, the Court will deny the § 2255 motion.

## 1. BACKGROUND

Petitioner came before this Court in 2017 originally on charges of armed robbery, conspiracy to commit armed robbery, attempted armed robbery, carjacking, use of a firearm in the commission of carjacking, and

conspiracy to commit credit card fraud. *See* Case No. 17-CR-29-2, ECF No. 15 ("CR-ECF").[1] His prosecution arose from his participation in a series of violent armed robberies and armed carjackings in 2016. During these crimes, Petitioner robbed multiple businesses, assaulted witnesses, stole multiple vehicles, and assaulted the vehicles' drivers in furtherance thereof.

Petitioner pleaded not guilty to the second superseding indictment, CR-ECF No. 50, before the Honorable Magistrate Judge William E. Duffin on May 31, 2017. CR-ECF No. 54. On October 19, 2017, the Honorable Magistrate Judge Nancy Joseph entered an order for psychological examination of Petitioner, CR-ECF No. 89, and Magistrate Judge Joseph later found Petitioner competent to proceed, CR-ECF No. 112.

The Court held jury trial from January 29, 2018 to February 5, 2018. CR-ECF No. 125. At trial, multiple of Petitioner's co-defendants testified for the Government. CR-ECF No. 169 at 10. The jury found Petitioner guilty on all counts. CR-ECF No. 131. On April 27, 2018, Petitioner was sentenced to a total term of imprisonment of 1,284 months and one day. CR-ECF Nos. 174, 178.

On May 4, 2018, Petitioner filed a notice of appeal. CR-ECF No. 185. That same day, Petitioner's trial counsel, Thomas E. Harris ("Harris") moved to withdraw. CR-ECF No. 187.[2] On June 13, 2018, the Court of Appeals granted Harris's motion to withdraw and simultaneously

---

[1] *See also* CR-ECF No. 169 at 5 (reciting that Petitioner was originally charged with Conspiracy (Count One), Hobbs Act Robbery (Count Two), Brandishing a Firearm in Relation to a Crime of Violence (Counts Three, Seven, and Nine), Attempted Hobbs Act Robbery (Count Six), Carjacking (Count Eight), and Aggravated Identity Theft (Count Ten) and noting that a second superseding indictment lodged additional counts against him).

[2] Prior to Harris, Petitioner was represented by Attorney Daniel Stiller at his arraignment and plea hearing. ECF No. 1 at 9.

appointed Attorney Michael Nash ("Nash") to serve as appellate counsel for Petitioner in his appeal. CR-ECF No. 219.

On August 5, 2019, the Court of Appeals affirmed the decision of this Court. CR-ECF No. 229. On appeal, Petitioner challenged this Court's handling of jury selection, its denial of Petitioner's *Batson* challenge, and an issue surrounding the cross-examination of government witnesses regarding the prison terms they avoided through cooperation. *Id.* at 1–2. The Court rejected each argument in turn and affirmed this Court's judgment. *Id*. at 22.

Petitioner filed the instant § 2255 motion on December 21, 2020. CR-ECF No. 236; ECF No. 1. He argues now only ineffective assistance of counsel. ECF No. 1 at 6. He argues specifically that "[t]rial counsel failed to seek suppression of evidence regarding out-of-court identification procedures," failed to "object to evidence about out-of-court procedures," failed to object to "car jacking victim's in-court identification of defendant," failed to "put on any witnesses in support of viable theory of defense that that was not me in video surveillance [sic]," and "refused to interview defendants [sic] family and associates" as to such video surveillance. *Id*. at 6–7.

## 2. ANALYSIS

### 2.1 Ineffective Assistance of Counsel Standard

The Seventh Circuit's *Blake* opinion neatly summarizes the standards applicable to a claim of ineffective assistance:

> A party asserting ineffective assistance of counsel bears the burden of establishing two elements: (1) that his trial counsel's performance fell below objective standards for reasonably effective representation, and (2) that counsel's

deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 . . . (1984)[.]

> To satisfy the first element of the *Strickland* test, appellant must direct the Court to specific acts or omissions by his counsel. In that context, the Court considers whether in light of all the circumstances counsel's performance was outside the wide range of professionally competent assistance. The Court's assessment of counsel's performance is "highly deferential[,] . . . indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" [*Id.* at 689.]
>
> . . .
>
> To satisfy the second *Strickland* element, appellant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable. A reasonable probability is defined as one that is sufficient to undermine confidence in an outcome.

*Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) (citations and quotations omitted).

## 2.2    Out-of-Court Identification by Photo Array

The Court begins with the first inquiry—whether Petitioner has demonstrated that Harris's performance fell below objective standards for reasonably effective representation. Petitioner has not so demonstrated. Again, his first argument relates to a carjacking victim's out-of-court identification of Petitioner through a photo array. Petitioner claims the photo array was unduly suggestive and argues that Harris's performance was deficient because he failed to seek suppression of or object to evidence of this out-of-court identification. ECF No. 24 at 1–2. Petitioner concedes in his briefing, however, that "[d]uring cross-examination[,] Defense Attorney Thomas Harris proceeded to challenge the identification of Aaron Sherman." *Id.* at 1.

The record evidence demonstrates that Petitioner's claim does not support a finding of ineffective assistance of counsel. Harris cross-examined the victim, Aaron Sherman ("Sherman"), extensively on the circumstances of his identification of Petitioner as his assailant.

A:    I was told that a different detective would be contacting me to do a photo lineup at the police station.

…

Q:    Did the officer that told you that suspects had been apprehended tell you anything about the suspects or describe the suspects to you?

A:    I'm not sure the officer told me that.

…

Q:    Were you shown any video evidence between the 4th and the 8th?

A:    No.

Q:    You weren't shown any Foot Locker video between the 4th and the 8th?

A:    No, I don't think I was shown any video. I may have been sent a photo but not—I wasn't sent any videos.

Q:    Okay. So you were sent a photo between the 4th and 8th. Do you recall what that photo depicted?

. . .

A:    I received a photo showing someone holding my keys.

Q:    . . . Who was holding your keys in that photo? Was it—

A:    I don't remember. I don't remember.

Q:    Police officer?

A:    I don't think it was—it didn't show—no, it was not a police officer. It wasn't someone—I don't think it even showed their face. It's just a photo of the keys in someone's hand.

Q:    Okay. Now, when you got to the cop shop on December 8th, I wrote down that you said, they were

having me identify; and then you went on to talk about two sets of photos. You said they were having me identify? Who's "they"?

A:   It was the one detective that I met with at the police station . . . . It was one detective there during the photo lineup . . . .

. . .

Q:   Okay. Now, when you got there, did they put a book in front of you with hundreds and hundreds of pictures and say go through this book and find a person?

A:   No. He, one person, not they—

Q:   Let me ask my next question. As opposed to you telling me what he did, let me ask my questions, if you don't mind, sir. So they didn't give you a book and have you page through hundreds of suspects; they did something else, correct?

A:   Correct.

Q:   Okay. Now—and they didn't walk a suspect—or suspects—one by one in front of you, like where you were viewing them through a glass; they didn't do a live presentation to you; they did something else, correct?

A:   Correct.

Q:   Okay. And when these photos were presented to you, I'm going to ask you if they were presented to you in the following fashion that I'm going to describe. Were there eight separate folders each containing one photograph of a suspect, and you were asked to open the first one; and if it wasn't that person, to set it aside, open the next one; if it wasn't that person, set it aside and likewise for eight photographs? Is that the procedure that was used?

. . .

Q:     Your testimony, young man, is that the officer put pictures on a table and said, pick out the guy, correct?

A:     It's not exactly what he said, but the process involved—he put out all of the photos and had me select the one that I recognized.

Q:     Okay. So he put them out all together. And would it be fair to say that you picked the one that looked the most like the assailant?

A:     Correct.

Q:     And your chances under that scenario was not 1 out of 100, but it was 1 out of 6 or 8, correct?

A:     I don't think you can use the word "chance" there.

Q:     That's my word. Let me rephrase the question then. Do you know if there were six or eight photographs put on the table in front of you?

A:     I don't know the exact number.

Q:     Okay. Now, if there were six—Strike that. When those photographs were put on the table by the detective, is it true or false that that detective told you who we suspect of being the guy in the black coat is one of these six guys or words to that effect?

A:     I think he said something similar.

Q.     Okay. Thank you for your honesty.

. . .

Q:     . . . One out of six random is about 16%, correct? I did that by going one divided by six is 16.666, almost 20 percent just random picking one out of six, correct?

A:     The actual math of one out of six would be approximately 20 percent.

Q:     Okay. Thank you.

. . .

Q:     This procedure where all—where a number of pictures were put on a table, six or eight; and you were told the person that we suspect of robbing you that was

wearing the black jacket is in these pictures. And then you made an identification. Was this procedure that we've been talking about to your knowledge videotaped so the jury can see exactly how it went down?

A:     I don't know if there was a camera in that hallway or not.

ECF No. 214 at 35–42. Clearly, Harris went to great length to attempt to demonstrate any potential impropriety in the handling of the photo array and Sherman's out-of-court identification of Petitioner as his assailant.

Petitioner argues that Harris should have objected to the photo identification being submitted into evidence and/or moved to suppress it. ECF No. 24 at 6. "Where a claim of ineffective assistance of counsel is based on counsel's failure to file a motion to suppress, the prejudice prong of *Strickland* requires that the motion would have been granted." *Perez v. United States*, 268 Fed. App'x 328, 331 (7th Cir. 2008). "Failure to raise a losing argument or pursue a futile motion to suppress does not constitute ineffective assistance." *Id.* (internal citation omitted).

Petitioner suggests that a motion to suppress would have been granted because Sherman's out-of-court identification of him contained no "indicia of reliability" and that Sherman had "less than a minute of face to face time" with the assailant. ECF No. 24 at 4. Respondent emphasizes, in response, that the photo array was held within "four days" of the carjacking and that Sherman definitively identified Petitioner in the array as "the subject who pulled the gun on me and placed it against my stomach, made demands, and drove the car away." ECF No. 7 at 9 (quoting ECF No. 214 at 19).

"Due process forbids law enforcement from using 'an identification procedure that is both suggestive and unnecessary.'" *United States v. Jones*, 872 F.3d 483, 490 (7th Cir. 2017) (internal citation omitted). "The 'danger to be avoided in identification procedures is that of *orchestrating* the procedure so that . . . the procedure implicitly suggests to the witness that "this is the man.""" *Id*. at 491. But "[e]ven when such a procedure is used, suppression of the identification is not the inevitable result." *Id.* at 490. "Suppression follows 'only where there is a very substantial likelihood of *irreparable* misidentification . . .'" *Id*. (internal citation omitted).

"To determine whether a specific identification procedure offends due process, we follow a two-prong approach." *Id*. First, "we consider whether the defendant has established that the procedure was 'both suggestive and unnecessary.'" *Id*. If so, "we examine the totality of the circumstances to determine whether other indicia of reliability outweigh the corrupting effect of law enforcement suggestion." *Id*. at 490–91 (internal quotation marks omitted). Even if there are "significant problems with the identification procedures employed," a court may still conclude that "the evidence was reliable enough to go to the jury with the usual procedural safeguards of a trial in place."[3] *United States v. Gonzalez*, 863 F.3d 576, 587 (7th Cir. 2017).

Part of Petitioner's argument is that Sherman should have been shown photos sequentially rather than all at once. It has been said that best practice is that "an officer should show photos sequentially rather than as part of an array." *Jones,* 872 F.3d at 491. It has been thought that "a

---

[3] And in any event, "[a]n error in the admission of identification evidence is harmless if the remaining evidence would have persuaded any reasonable jury beyond a reasonable doubt of the defendant's guilt." *Gonzalez*, 863 F.3d at 587.

sequential display is preferable because it forces the witness to compare each photograph against memory, rather than one photograph against another. . . ." *United States v. Johnson*, 745 F.3d 227, 228 (7th Cir. 2014). But the Seventh Circuit has also acknowledged that "some recent research has called into question the view that sequential presentation of photographs is superior to photo spreads." *Jones,* 872 F.3d at 491–92 (internal citation omitted); *Johnson*, 745 F.3d at 229 ("[S]ome recent research has called into question the view that sequential presentation of photographs is superior to photo spreads."). So the fact that the photos were not shown to the witness sequentially, one at a time, does not demonstrate that the procedure was suggestive to the point of requiring suppression. And even if sequential display was conclusively determined to be the best approach, that would not be dispositive. "The Supreme Court has not adopted a rule that only 'the best' approach . . . can be used." *Johnson*, 745 F.3d at 229.

Petitioner additionally claims that the officer administering the photo array impermissibly informed Sherman that the assailant's photo was included therein. ECF No. 24 at 3 ("Sherman also asserted that the detective while displaying the simultaneous photo-array he (the detective) 'said something similar' to 'who we suspect of being in the black coat is one of these six guys'."). Indeed, Sherman conceded that the officer said "something similar" to the assailant being "one of these six guys." ECF No. 214 at 41. Petitioner argues that this was unduly suggestive.

It is true that "[c]areful officers tell a witness that a photo spread does not necessarily include any suspect." *Johnson*, 745 F.3d at 228. And informing the witness that the suspect's photo is included in the array may contribute to the conclusion that the out-of-court identification was suggestive. *Simmons v. United States*, 390 U.S. 377, 383 (1968) ("The chance

Case 2:20-cv-01883-JPS   Filed 03/27/23   Page 10 of 22   Document 25

of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."). But nothing else about the out-of-court identification here lends itself to that conclusion,[4] and the Court has identified no caselaw wherein the witness's knowledge that the suspect is among those in the array is so suggestive in and of itself that it invalidates the identification. To the contrary, the case law the Court has located provides the opposite. *See United States v. Mathis*, No. 2:07-cr-266, 2008 U.S. Dist. LEXIS 37618, at *20–21 (S.D. Oh. May 2, 2009) ("[P]hoto arrays generally become unnecessarily suggestive only when the officer conducting the array directs the witness to pick one *specific* photograph or otherwise indicates *which* photograph is the suspect, not when the officer merely indicates that the suspect is or may be somewhere in the array."); *United States v. Russell*, 532 F.2d 1063, 1067–

---

[4]For example, Petitioner makes no suggestion that the photos included in the lineup were themselves suggestive. The Seventh Circuit described a photo array that was deficient in this respect:

> Two of the lineup photographs are so dark that it is difficult to discern facial features with any certainty. In both of those photos, because of the lighting and the angles at which the pictures were taken, it is difficult to see either man's head to determine the state of his hair. . . . . One of those men is too old for the age range given, and the other is too young . . . . Of the remaining two men, Gonzalez's photo is the clearest and brightest on the page. In our view, the six-person photo lineup was suggestive in and of itself.

*United States v. Gonzalez*, 863 F.3d 576, 585 (7th Cir. 2017); *see also Bolden v. Pesavento*, No. 17-cv-417, 2022 U.S. Dist. LEXIS 153014, at *25 (N.D. Ill. Aug. 25, 2022) ("[The defendant] looked different than the others in the lineup. And critically, he looked different in a way that would point [the witness's] pair of eyes in [the defendant's] direction."). No such issues are alleged here.

Case 2:20-cv-01883-JPS   Filed 03/27/23   Page 11 of 22   Document 25

68 (6th Cir. 1976) (where agent told witness that the picture she selected was "the guy we think probably did it," agent's conduct was not suggestive to the point of requiring suppression); *State v. Styles*, 962 So. 2d 1031, 1035 (Fl. Ct. App. 2007) (detective's statement to witness that the assailant's photo was in the array was, alone, insufficient to deem the procedure suggestive and require suppression of identification) ("Even if the detective had told the victim that his assailant was pictured in the array, he did not tell him which picture to choose."); *People v. Smith*, 528 N.Y.S.2d 872, 873 (out-of-court identification not automatically contaminated by officer's remark that suspect in custody was included in photo array) (N.Y. App. Div. 1988).

And contrary to Petitioner's assertion, there are some indicia of reliability in the out-of-court identification. "In considering whether an identification made in suggestive circumstances is still reliable, courts consider: the opportunity of the witness to view the offender at the time of the crime; the witness' degree of attention; the accuracy of the prior description of the offender; the level of certainty exhibited at the confrontation; and the length of time between the crime and the confrontation." *United States v. Gonzalez*, 863 F.3d 576, 586 (7th Cir. 2017).

In describing the process of the photo lineup, Sherman recalled that there were "approximately eight different photos that were shown" in the array and that he was asked "to identify if any of them were familiar or if they looked like the person that had approached" him. ECF No. 214 at 17. He confirmed that he had not seen the photos before they were presented to him in this photo array[5] and that the detective who showed him the

_____

[5]"That Miller had seen two photographs of Gonzalez only two days earlier lends weight to a conclusion that the entire process was unnecessarily suggestive." *Gonzalez*, 863 F.3d at 585.

photos made no "statements . . . that seemed to suggest who the target was." *Id*. He clearly identified an individual in the array as the "subject who pulled the gun on me and placed it against my stomach, made demands, and drove the car away." *Id*. at 19. When Sherman was shown footage at trial of Petitioner in a Foot Locker store, Sherman recognized aspects of Petitioner's clothing as matching that which his assailant had been wearing at the time of the carjacking. ECF No. 213 at 262.

As noted, the amount of time that has passed between the commission of the crime and the out-of-court identification is relevant to reliability. *See United States v. Benabe*, 654 F.3d 753, 775 (7th Cir. 2011). And "where a witness makes an identification with certainty, this factors reliability." *United States v. Velasquez*, No. 2:11-CR-77(12)-PPS-APR, 2013 U.S. Dist. LEXIS 112266, at *29 (N.D. Ind. Aug. 8, 2013).

As noted by Respondent, the out-of-court identification was made here within a matter of days after the carjacking and apparently without hesitancy. ECF No. 214 at 16 (Q: "On December 8, 2016, about four days after the carjacking, did you go to the police department related to this case?" A: "Yes."). That supports a finding of reliability. *See Gonzalez*, 863 F.3d at 586 (noting as indicator of reliability that witness confidently identified defendant only two days after the commission of the crime); *Velasquez*, 2013 U.S. Dist. LEXIS 112266, at *11–12, 31 (noting as indicator of reliability that witnesses promptly and without hesitation identified defendant three days after the commission of the crime). Identifications made even months after initial contact with suspects can be reliable in some circumstances. *Velasquez*, 2013 U.S. Dist. LEXIS 112266, at *30–31.

Another indicator of reliability is that the witness "faced [the defendant] directly and intimately." *Neil v. Biggers*, 409 U.S. 188, 200.

Although Sherman concedes that he wasn't "actively focusing on making sure [he] could pick out details" of what his assailants looked like, he "remember[ed] everything that happened." ECF No. 214 at 27–28, He testified that he was face-to-face with Petitioner during part of their interaction and that Petitioner was close enough to press a gun into Sherman's stomach. This occurred in the middle of the day, in broad daylight. ECF No. 212 at 23. As in *Biggers*, the victim here was "no casual observer, but rather the victim of" the crime. *Biggers,* 409 U.S. at 200.

Sherman was within reaching distance of Petitioner for roughly two minutes while the perpetrators held him up at gunpoint, took his keys and other possessions from his hands, removed his wallet from his back pocket, got into Sherman's vehicle, and told Sherman several times that he "should have known better." ECF No. 213 at 258. Sherman testified that despite his anxiety about the situation, he remained "very present." ECF No. 214 at 26. His degree of attention, therefore, supports a finding of reliability. And although he did not have a lengthy opportunity to view the offender, the time he did have was intimate and in bright daylight. He testified that he "distinctively remember[ed] the tattoos on the guy that was taking [his] stuff," "the color and the type of material on the guy with the gun's jacket," the "color of his pants," and "what the gun look[ed] like." *Id*. at 28.

It is also relevant that "issues regarding the reliability of [a] witness['s] identification [were] fully aired on cross-examination for the jury to evaluate them." *Benabe*, 654 F.3d at 775. Indeed, "[p]erpetual biases and errors are endemic to identification," and the "normal way of dealing with them is to expose the problem at trial so that a discount may be applied to the testimony, rather than to exclude relevant evidence." *United States v. Williams*, 522 F.3d 809, 811 (7th Cir. 2008). Here, Harris cross-examined

Sherman at length in an attempt to point out potential flaws in the out-of-court identification process employed. That was an appropriate way to attempt to undermine the reliability of the identification.

Petitioner has not demonstrated that the out-of-court identification procedure was "orchestrat[ed]" to "implicitly suggest[] to the witness" that Petitioner was the assailant. *Jones*, 872 F.3d 483, 490–91. The Court is not convinced that a motion to suppress would have been granted had it been made. And Harris's "decision to forego [a] motion to suppress was well within the range of professionally competent assistance" in light of the alternative avenue of cross-examining the victim-witness surrounding the circumstances of his identification of Petitioner. *See Williams v. Polk*, No. 03-0354-JLF, 2005 U.S. Dist. LEXIS 10668, at *6–7 (S.D. Ill. May 23, 2005). And in any event, the Court cannot conclude, in light of the extensive evidence of Petitioner's guilt, that there "is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different." *Blake*, 723 F.3d at 879 (citations and quotations omitted). As such, Petitioner's claim that Harris's failure to move to suppress evidence of the out-of-court identification constituted ineffective assistance of counsel fails.

### 2.3    Surveillance Footage

Petitioner additionally alleges that Harris's performance was deficient because he failed to pursue the defense that it was not Petitioner in video surveillance evidence.[6] He does not state to which video

---

[6]This claim is raised in Petitioner's motion, but he does not address it in his reply whatsoever.

Case 2:20-cv-01883-JPS   Filed 03/27/23   Page 15 of 22   Document 25

surveillance evidence he refers (multiple of the crimes for which Petitioner was convicted were recorded by video surveillance).[7]

"Under Strickland, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Anderson v. United States*, 981 F.3d 565, 575 (7th Cir. 2020) (internal citation omitted). Moreover, "[c]ounsel has no duty to make a frivolous argument." *Russell v. United States*, No. 12-1016-DRH, 2013 U.S. Dist. LEXIS 138174, at *11 (S.D. Ill. Sept. 26, 2013).

It was entirely reasonable for Harris to forego the relatively weak argument that it was not Petitioner in all of the video surveillance footage. To so argue would have been refuted by the bulk of the evidence and ultimately futile. The evidence that it was, indeed, Petitioner in the locations of the crimes at the times of their commission was extensive.

First, a victim testified to the armed robbery in which Petitioner participated at Roman's Food Market. ECF No. 169 at 6; ECF No. 212 at 45–74. The victim observed Petitioner and a co-defendant flee the scene and was able to identify with detail the vehicle in which they fled. ECF No. 169 at 6–7. The surveillance footage from the Roman's Food Market showed an individual (Petitioner) wielding a gun that was later identified by multiple people as one Petitioner owned. *Id.* at 7; ECF No. 212 at 94, 214. Petitioner's co-defendants later testified as to Petitioner's participation in the armed robbery. ECF No. 169 at 7. Multiple witnesses testified to recognizing

---

[7]At least as to one of the videos, Harris did attempt to argue that Petitioner was not clearly identifiable therein. ECF No. 212 at 136. ("It was the back of his head, wearing a black, puffy jacket, correct? . . . You can't see a face."). The Court assumes, therefore, that Petitioner attempts to argue that Harris ought to have made a similar argument as to all, or some of, the other pieces of surveillance footage.

Case 2:20-cv-01883-JPS   Filed 03/27/23   Page 16 of 22   Document 25

Petitioner's face, which had been only partially obscured, in the surveillance footage. *Id*. A co-defendant also testified that he recognized Petitioner in the footage by the clothes and bandana he had on, and that he also recognized Petitioner's distinctive, bowlegged walk. ECF No. 212 at 213–14, 221. Multiple witnesses also testified that they observed Petitioner with a large quantity of cigarettes after the robbery, and that the robbery involved the theft of several cartons of cigarettes. ECF No. 169 at 6, 8; ECF No. 212 at 75; ECF No. 213 at 167.

There was also surveillance footage at Aurora Sinai Hospital where Petitioner conducted an armed carjacking. Again, there were multiple indicia of Petitioner's participation therein beyond the surveillance footage. At the time of the carjacking, the victim (a delivery driver) had multiple Chinese food orders in the vehicle as well as in his hands. He testified that his assailants took the food from him, in addition to other of his possessions and his vehicle. ECF No. 212 at 162. Petitioner was identified by multiple witnesses as having brought a large amount of Chinese food to the residence that night. ECF No. 169 at 8. Two of Petitioner's co-defendants, plus another witness, identified Petitioner from the surveillance footage. They recognized his clothing as matching that which Petitioner was wearing when he arrived that night with the Chinese food. *Id*. A co-defendant also testified that Petitioner had disclosed to him that Petitioner committed the carjacking. *Id*.; ECF No. 214 at 92.

Petitioner also participated in a robbery of a George Webb restaurant. A victim of the robbery observed the suspects flee and was able to describe the vehicle in which they fled. ECF No. 169 at 9. Petitioner's co-defendants testified that they participated with Petitioner in this robbery and that Petitioner drove the getaway vehicle. *Id*. A non-defendant witness

additionally identified Petitioner as the suspect who brandished a black handgun at the robbery. *Id*. at 10; ECF No. 212 at 98 (non-party witness recognizing Petitioner in footage based on body size and gun).[8] Additionally, Petitioner's then-girlfriend told law enforcement that a .22 caliber revolver used in the George Webb robbery was one she had seen Petitioner possess. ECF No. 169 at 9. The morning after this robbery, the getaway vehicle was recovered in a parking lot across the street from a residence with which Petitioner was associated. Inside the vehicle were a receipt for a transaction at the George Webb restaurant, which had been pulled from the register during the robbery, and a nylon stocking consistent with those worn by Petitioner and the co-defendants during the robbery. *Id*. at 8–9.

Petitioner also participated in an attempted robbery of a Walgreens. Multiple witnesses viewed the surveillance footage of this event and identified Petitioner. *Id*. at 11. Another witness testified to having heard Petitioner and a co-defendant discussing this robbery. *Id*.; ECF No. 212 at 100 (non-party witness stating that she heard Petitioner saying he was "going to get away with the robbery").

Petitioner and a co-defendant were thereafter identified in surveillance footage from a Foot Locker store. ECF No. 212 at 104–05, 139; ECF No. 213 at 7. Records showed that Petitioner and the co-defendant used a stolen credit card from a carjacking to purchase merchandise at the Foot Locker. ECF No. 213 at 262. A non-party witness recognized Petitioner's

_____

[8]As to this point, Harris on cross-examination succeeded in having the witness concede that there are "a whole lot of guns that are black," thereby reducing the weight of her identification of the gun as that of Petitioner. ECF No. 212 at 137.

"dark complexion," his round eyes, his height, and his manner of movement in the surveillance footage. ECF No. 212 at 105, 139. Another co-defendant additionally testified to having heard Petitioner talking about having purchased new clothes and shoes from Foot Locker. ECF No. 213 at 6.

For each of these crimes, the surveillance footage was just some of the evidence demonstrating Petitioner's involvement. To have argued that it was not Petitioner in each and every one of those videos would have been a weak defense and ultimately would not have changed the outcome of Petitioner's trial. For these reasons, Petitioner has not shown that by declining to pursue the argument that it was not Petitioner in the surveillance footage "his trial counsel's performance fell below objective standards for reasonably effective representation."[9] *Strickland,* 466 U.S at 687–88 (1984).

**3.    CONCLUSION**

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686. That benchmark is not met here, and this Court will not play "'Monday morning quarterback' when reviewing claims that an attorney rendered constitutionally deficient representation in making decisions on how best to handle a case." *United States v. Malone,* 484 F.3d 916, 920 (7th Cir. 2007) (internal citation omitted).

---

[9]And even if Petitioner had so shown, he has not demonstrated, and would not be able to demonstrate, that the deficiency prejudiced him since the evidence against him was otherwise extensive.

On the whole, Harris zealously defended Petitioner. He emphasized deficiencies in the prosecution's case. ECF No. 212 at 30 ("[W]e're not going to have DNA, we're not going to have prints, we're not going to have a confession . . . ."). He stressed potential credibility issues with Petitioner's testifying co-defendants. *Id.* ("These people that are connecting Mr. Hunter . . . to these offenses are, to put it mildly, untrustworthy."); ECF No. 213 at 66 ("Four months after you lied repeatedly you decide to switch teams, right?") and at 85 (Q: "Would you consider yourself a very believable kind of guy?" A: "No."). He objected to improper questioning. ECF No. 212 at 95. He went to great lengths to minimize the effect of the testimony of other adverse witnesses. *Id*. at 140–43 (Q: "And you want to do anything you can to try to help [the other defendants] to get a soft sentence and not a harsh sentence, right?" A: "I'm doing what's right and what needs to be done." Q: "You could have done what's right a long time before now, though, right?" A: "Yes." Q: "Okay. You can understand how a lot of people would be very suspicious about this late realization of doing what's right.") and at 178 (Harris cross-examination of first carjacking victim: Q: "And you can't describe them in any further detail whatsoever, correct?" A: "Yes.").

For the reasons discussed herein, the Court must deny Petitioner's § 2255 motion. The Court must also address one additional matter. Under Rule 11(a) of the Rules Governing Section 2255 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The petitioner "need not show he is likely to prevail, but he must show that

Case 2:20-cv-01883-JPS   Filed 03/27/23   Page 20 of 22   Document 25

'reasonably jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014) (quoting *Slack*, 529 U.S. at 484).

In light of the well-settled principles governing the disposition of Petitioner's claims, as outlined above, the Court cannot fairly conclude that reasonable jurists would debate whether his motion should be decided differently; as a consequence, the Court must deny a certificate of appealability to him.

Accordingly,

**IT IS ORDERED** that Petitioner's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, ECF No. 1, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that a certificate of appealability be and the same is hereby **DENIED**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27th day of March, 2023.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.